IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF
ILLINOIS EASTERN DIVISION

| | | |
|---|---|---|
| TINKA VASSILEVA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 1:19-cv-04064 |
| | ) | |
| v. | ) | District Judge Valderrama |
| | ) | |
| CITY OF CHICAGO, | ) | Magistrate Judge Fuentes |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

Plaintiff, TINKA VASSILEVA, through her counsel, respectfully submits this Memorandum in Opposition to Defendant's Motion for Summary Judgment.

**I.     Plaintiff's Background**

Plaintiff obtained her Master's Degree in Chemical Engineering in 1997; she has a Bachelor's Degree in Chemical Engineering as well as a Bachelor's Degree in pediatric nursing. SOF ¶ 1. In 2006, she obtained a Public Water Operator License, Class A, which is the highest level, from the Environmental Protection Agency. SOF ¶ 2. She also obtained a certificate from DeVry University in project management in 2011. *Id*.

In July or August 2001, Plaintiff was hired by the Defendant as a Filtration Engineer II in the Department of Water Management ("DWM"). SOF ¶ 3. Since that time, Plaintiff has worked in each of the different sections of the DWM, including the Mechanical, Instrumentation, Operations, and Chemical Inventory sections and is trained to perform all jobs within the DWM's Bureau of Water Supply. SOF ¶ 4. Despite her extensive experience and repeated attempts at promotion, however, Plaintiff maintained her FE II position for eighteen years; she was finally promoted to the position of FE III on July 1, 2019. SOF ¶¶ 21-23. For the last two

1

decades, while Plaintiff's career has remained stagnant, Filtration Engineers who are non-Bulgarian, much younger, predominantly male, with less experience, qualifications, and seniority than Plaintiff, were promoted one or more steps higher than their current positions and have been promoted and acted-up through the ranks of the DWM. Over at least the last seven years at the Jardine Water Plant, there have been eight FE V positions, nine FE IV positions and seven FE III positions. While Plaintiff understands that she cannot be compensated for all past wrongs, it is important for this court to understand – at a macro level – what has been happening to Plaintiff and her engineering career at the DWM.

## II. Defendant's History of Failure to Promote

Plaintiff's continuous service date, which determines seniority, is August 1, 2001. SOF ¶ 8. In December of 2007, Plaintiff applied for promotion to one of two vacant FE IV positions. SOF ¶ 9. Plaintiff was permitted to interview in January 2008, and ultimately received the second highest interview score with a 3.88. Jack Wroblewski received the highest average of 4.19, while Harold Keaton and Krystyna Reschke received scores far below Plaintiff. *Id*. The Deputy Commissioner of the Bureau of Water Supply as well as the Assistant Chief Filtration Engineer recommended that Plaintiff be placed into one of the open FE IV positions. *Id*. Despite the January 2008 recommendation, Plaintiff was never promoted to FE IV. SOF ¶ 10. While both the collective bargaining agreement and the City's Personnel Rules required position vacancies are to be filled as expeditiously as possible, the FE IV vacancies remained vacant from 2008 through 2015. *Id*.

Meanwhile, Chamoon Anawes, a non-Bulgarian male, one of Plaintiff's comparators, began service on August 16, 2001, two weeks after Plaintiff. SOF ¶ 8. On January 1, 2009, however, Mr. Anawes was promoted to the position of FE III (or IV according to his resume).

The FE III position given to Mr. Anawes on January 1, 2009 was never posted in accordance with the collective bargaining agreement and Plaintiff was never made aware of that opportunity for promotion. *Id*. Instead, while Mr. Anawes was promoted into a FE III position that had never been posted, Plaintiff was laid off in December 2008; and although she was immediately recalled and transferred into an equally-rated, vacant FE II position, she was laid off again in July 2009 when she was bumped by a non-Bulgarian male with less seniority, Syed Raheem. Mr. Raheem, who had never before worked for the DWM and had transferred from the Defendant's Department of Transportation, was apparently permitted to bump Plaintiff from her FE II position; Plaintiff was not recalled until May 2011.

In August of 2015, Plaintiff applied for one of eight available FE IV positions, but she was not selected. SOF ¶ 11. Candidates with less seniority, qualifications, and experience were selected to fill the positions. *Id*. Herberto Rodriguez and Jeffery Wyteniec, both men of non-Bulgarian decent with less seniority, less experience, no Class A license and no Master's Degree, were both promoted from FE II positions to FE IV. *Id*. Miguel Guzman, a male of non-Bulgarian decent, Krystyna Reschke, a female of non-Bulgarian descent, and Harold Keaton, a male of non-Bulgarian decent, each of whom had less seniority, qualifications, and experience than Plaintiff, were promoted from FE III to FE IV. SOF ¶ 12. Then, in late September 2016, Plaintiff applied for a vacant FE V position and after an interview, was denied the promotion. SOF ¶ 14. Plaintiff pursued claims of discrimination and retaliation based on these 2015 and 2016 denials in *Vassileva I*.

Despite the FE IV promotions in 2015 which created numerous FE III vacancies, Defendant did not open any FE III vacancies until 2019. SOF ¶ 13. Instead, for several years, the FE IVs were acting as FE IIIs in the Control Center, but getting paid as FE IVs, including

3

overtime, sick days, vacations, and holidays. In July 2019, Plaintiff was finally promoted to FE III. *Id*.

More recently and on or about June 2018, Plaintiff again applied for a FE V vacancy, but was denied an interview by the same City Recruiter, Martin Wise, who had permitted her to interview for the FE V vacancy in 2016. SOF ¶¶ 15-18. Plaintiff was then, in 2019, denied the opportunity to be considered for a FE IV position because she was a qualified bidder for one of several FE III promotions that had opened in March 2019. SOF ¶¶ 21-26. Plaintiff's similarly situated colleagues, who were also qualified bidders, were told by Defendant that the FE IV positions would soon come available and if they took the FE III positions, they would not be able to apply for the FE IV positions. *Id*. Thus, Plaintiff's similarly situated non-Bulgarian colleagues, each of whom was under the age of forty, declined to accept the FE III positions. *Id*. Plaintiff was not told of the impending FE IV opportunity and was again unable to achieve promotion consonant with her similarly situated colleagues. *Id*. These 2018 and 2019 failure to promote claims are raised in this matter.

**III.** **Plaintiff Possessed Minimum Qualifications for the 2018 FE V Position**

As already noted, the hiring process has been directed on a City-wide basis by Martin Weiss at City Hall since 2011. SOF ¶ 15. Mr. Wise was the recruiter for a FE V position in the Department of Water Management posted on April 12, 2018 (Position No. 307335). *Id*. The duties of the FE V position posted in 2018 include, among other things, "[u]nder general supervision, supervises an engineering unit at one of the water purification plants. . . . Supervises professional and skilled trades personnel engaged in monitoring water purification processes and adjusting pumpage rates and chemical dosages used to maintain water quality standards." SOF ¶ 16. Moreover, duties include supervises the development of specification for new equipment

4

purchases, the ordering and maintenance of chemical inventories, the installation and testing of new and refurbished equipment, and the maintenance of plant records and the preparation of related reports, plans and research studies. SOF ¶ 16. These are the same "essential duties" set forth in the Bid Announcement for FE V in September 2016 (Position No. 275160). Id.

The qualifications for the FE V position in 2018 with respect to training and experience were:

> Graduation from an accredited college or university with a Bachelor's degree in Chemical or Civil Engineering or a directly related field of engineering supplemented by four years of progressively responsible filtration engineering experience including one year of supervisory experience, or an equivalent combination of training and experience, provided the minimum degree requirement is met. A Class "A" Public Water Supply Operator license is required.

The qualifications with respect to training and experience for the FE V position in 2016 are identical. SOF ¶ 16.

The 2018 Bid Announcement indicated that applicants could submit the information about educational background and work experience by attaching a resume, pasting a resume, or completing the online resume fields. Moreover, it explained, "[y]our initial evaluation will be on information provided on the application form and documents submitted with the application." Plaintiff provided Defendant with all necessary information including that related to her "four years of progressively responsible filtration engineering experience including one year of supervisory experience, or an equivalent combination of training and experience." In 2018, Plaintiff provided Mr. Wise the same information, with updates, as she had provided him in 2016. SOF ¶ 17.

**IV.     Defendant's Explanation for Denying Plaintiff an Interview in 2018 Is False**

5

In 2018, Mr. Wise claimed that because Plaintiff held the position of FE II at the time she applied for the FE V position, she therefore did not have the requisite supervisory experience. He explained, from "at least 2011 to the present, FE II is not and has not been a position which supervises as an essential job function. Additionally, acting up experience does not count for supervisory experience for recruiting bid positions for DWM." However, in 2016, Plaintiff was an FE II and was found eligible, by Mr. Wise, to interview for the FE V vacancy. SOF ¶ 18. John Ellis was also an FE II in 2016 and was permitted by Mr. Wise to interview for the FEV position. *Id*. Mr. Wise has never explained why Plaintiff was eligible to interview in 2016, but allegedly, not eligible in 2018.

Moreover, there is nothing in the position description which requires that the supervisory experience requested be an "essential job function" and in fact, the job description stated that in lieu of "one year of supervisory experience," an applicant may have "an equivalent combination of training and experience, provided the minimum degree requirement is met." SOF ¶ 20. Moreover, even if "supervisory experience" as an essential job function is required, the FE II Job Description states "NOTE: while the list of essential duties is intended to be as inclusive as possible, there may be other duties which are essential to particular positions within the class." *Id*.

Plaintiff's 2018 FE V application indicates that she has at least one year of supervisory experience related to the responsibilities of the position. SOF ¶ 17. Moreover, in her resume, she indicates, among many other things, that as a FE II since 2001, she "[s]upervised Control Chemists on assigned shifts," "[s]upervised staff engaged in compiling contract packages for submission to the Department of Procurement Services," and "[s]upervised outside contractors as required." *Id*. Further, Plaintiff states that she has a Master's of Science in Chemical

6

Engineering.  Finally, Plaintiff sets forth her extensive specialized training in chemical water treatment.  When Plaintiff worked in the Mechanical Section in 2009, she served several times as a supervisor when her supervisor was on vacation.  In approximately 2010, Plaintiff began working under the supervision of Yadi Babapour.  From 2010 through the end of 2012, the Control Center was two-person control so Plaintiff would have had occasion to work as an FE II in the Control Room during that time.  In 2012, Plaintiff performed the duties of an FE III in the Control Center with pay.  Plaintiff also supervised the chemists and the operator engineers whenever she worked as an FE II or acting FE III in the Control Center.  *See,* SOF ¶¶ 1-7.

Finally, Defendant admitted in *Vassileva I* that an FE II may apply for an FE V position and the promotion process had been generally the same from 2006 through 2018, which directly contradicts Mr. Wise's claims.  SOF ¶ 19.

In 2018, if Plaintiff would have been permitted to interview for the FE V vacancy, she likely too would have been placed on the pre-qualified referral list;  she had seniority over both Mr. Awes and Mr. Keon and would have been eligible for hire after Mr. Wroblewski.  Mr. Anawes, Mr. Keon, and Mr. Wroblewski were each non-Bulgarian males.  Interestingly, each of the three men were of Plaintiff's approximate age and experience level.  The other applicants in Plaintiff's collective bargaining unit who were not placed on the referral list, Maruja Yoshimura and Ethan Baughey, were much less experienced than Plaintiff, Wroblewski, Anawes and Keon.

While the Defendant claims that Plaintiff cannot demonstrate that the FE V position was awarded to someone outside her class who was not better qualified, this does not accurately reflect how the Defendant's interview process works.  According to the Defendant, once Mr. Wise creates the referral list ensuring "minimum qualifications," the candidates are interviewed. The candidate's performance at the interview and nothing else determines if the candidate is to

7

be placed on the prequalification list. Who is more qualified is irrelevant. Once a candidate is placed on the prequalification list, the positions are filled based upon seniority. Plaintiff had more seniority (qualifications, training and experience) than Keon and Anawes. Defendant denied Plaintiff the opportunity to interview for the FE V position. Defendant has failed to provide any legitimate evidence showing that Plaintiff would not have been included on the prequalified list with each of the other applicants. There are genuine issues of material fact in dispute.

**V.     Defendant Treated Plaintiff Differently From Her Similarly Situated Colleagues With Respect to the 2019 FEIV Position**

As noted *supra*, in 2015, there were a number of promotions into the FE IV positions which left open several FE III vacancies. Despite these available vacancies, from 2015 through 2019, Defendant did not open any of them. Instead, for several years, the newly-elevated FE IVs were acting as FE IIIs in the Control Center, but getting paid as FE IVs, including holidays, overtime, and vacation. This was not only very costly for the City, it deprived Plaintiff of the ability to move out of her FE II position.

On June 12, 2019, seven employees, Syed Raheem, Tinka Vassileva, Maruja Yoshimura, Mohammad Ashayeri, Mohammad Mashal, Ahmed Almhana, and Matthew Matti, interviewed for newly-opened FE III positions. On June 13, 2019, a consensus meeting was held and all the candidates were placed on the PQC approval list. Thereafter, Sharon Jackson met privately with each of the employees from June 17, 2019 through June 20, 2019.

After speaking with Sharon Jackson, Syed Raheem, Tinka Vassileva, and Matthew Matti accepted the FE III positions. However, after speaking with Ms. Jackson, the other four candidates declined the FE III positions. Maruja Yoshimura signed waiver a waiver on 6/18/19, indicating she was "waiting for another position to open and would like to remain eligible for

8

consideration." Mohammad Mashal signed a waiver on 6/18/19 stating in part, that he did not want to be excluded "from other opportunities that will come in six months." Mohammad Ashayeri signed a waiver on 6/20/19 stating, "I will become ineligible for the other internal job opportunities for the next six months if I accept this position." Ahmed Almhana signed a waiver on 6/20/19, explaining "may be waiting for higher position."

While Sharon Jackson denies having told the four candidates about the upcoming FE IV positions, recruiting for the new FE IV positions began in March 2019. Both Sharon Jackson, Martin Wise, and Ed Salinas participated in the Intake Session for those positions on March 19, 2019; Defendant was clearly aware that the positions would be opening. Moreover, a job vacancy is not disclosed to the employees until a Bid Announcement is posted and disseminated which did not occur until July 3, 2018, just days after the waivers were signed.

Plaintiff was not told that there would or could be upcoming FEIV openings for which she would be ineligible if she accepted the FE III position. If she had been told of the FE IV openings, she would have also waived the FE III position.

On November 13, 2019, a consensus meeting for the new FE IV positions was held and Maruja Yoshimura, Mohammad Ashayeri, Mohammad Mashal, and Ahmed Almahana were each placed on the PQC list and except for Almahana, were promoted. In fact, all seven bid candidates were placed on the PQC list. Had Plaintiff been told of the upcoming vacancies, she surely would have been placed on the PQC list and would have been promoted. Plaintiff had seniority over each of the candidates, but for Hazem Zahdan.

**VI.  Defendant's Explanation for Not Permitting Plaintiff to Act Up
     as a FE III Is False**

The collective bargaining agreement, as well as the Defendant's policy and practice, presumes that an employee has the present ability to perform the duties of her higher-graded title.

9

The relevant pool of employees eligible to act-up generally consists of "all employees in the title directly below the Acting Up title." The collective bargaining agreement clearly states that the department may limit the relevant pool to work shift, location, or only those employees possessing a required license or certification if operationally necessary.

Eligible employees in the relevant pool shall be offered Acting Up opportunities on the basis of seniority. If an employee who is available and willing to act up is not included in the Acting Up rotation, the Department Manager must provide to Department Head a memorandum justifying the decision which includes providing the reasons for not selecting each employee in the relevant pool who is more senior that the selected employee. FE IIs who are permitted to Act-Up in the Control Center get the benefit of "experience and training." Moreover, FE IIs working in the Control Center have greater overtime opportunities because they can cover people calling in sick or unavailable on a 24/7 basis.

On December 30, 2017, Yadi Babapour authorized Plaintiff to work in the Control Center and Plaintiff was placed on the rotation schedule for 2018. On or about February 22, 2018, Mr. Babapour confirmed with Plaintiff that she was scheduled to start Acting-Up the following week. The next day, however, Mr. Babapour informed Plaintiff that she would not begin Acting-Up and that Maruja Yoshimura was assigned to Plaintiff's rotation. Mr. Babapour told Plaintiff that this decision did not come from him, but from Ed Salinas. He told Plaintiff that she would receive an explanation from John Pope that Monday; she did not. Plaintiff did not receive any explanation until July 2018, when she learned that Defendant claimed she was not eligible to Act-Up because of three alleged deficiencies occurring on December 16, 2017, January 17-19, 2018 and February 2, 2018. These allegations were falsified.

10

Defendant, through Jack Wroblewski, the FE V with whom Plaintiff had been closely working, admitted to Plaintiff that John Pope and Yadi Babapour had called unexpectedly called him into Mr. Pope's office on January 23, 2018, on his day off, and instructed him to sign a pre-drafted document criticizing Plaintiff's work performance. Mr. Wroblewski told Plaintiff that he told Mr. Babapour and Mr. Pope that Plaintiff was working with him and that she was performing as an FE III and was ready to be acting up in the Control Center. Mr. Wroblewski said that he tried to explain to Babapour and Pope that Alum changes, one of the criticisms made, were a regular practice and that Plaintiff was not at fault; the men told him to sign the papers anyway. He told Plaintiff that, although he did not agree with the written criticisms, he did sign the paperwork. Mr. Wroblewski apologized to Plaintiff and appeared ashamed when he admitted that he anticipated receiving four additional overtime hours for his deeds. In April 2018, Defendant removed Mr. Wrobleski from the shift schedule so that he could work in the Tech Office, a change Mr. Wroblewski had been seeking for some time.

Similarly situated non-Bulgarian colleagues with fewer qualifications, seniority, education, and experience were allowed to Act-Up throughout 2018. Sanket Patel and Brandon Ramirez, two non-Bulgarian males, who started in 2016 were permitted to act up as FE IIIs. Syed Raheem, Ahmed Almhana, and John Ellis, each non-Bulgarian male were also permitted to act up as FE IIIs. One female FE II, Maruja Yoshimura, non-Bulgarian, was permitted to Act-Up as well. Further, most of the FE IIs permitted to Act-Up were much younger than Plaintiff, including Maruja Yoshimura, Ahmed Almhana, Sanket Patel, and Brandon Ramirez. Only Syed Raheem, who started in the Department of Water in 2009, was over the age of forty. With the exception of Matthew Matti, a new employee, Plaintiff was the only FE II not permitted to act up as an FE III in the Control Center.

Moreover, even assuming that Plaintiff was deficient at the beginning of 2018, she received additional training and no additional deficiencies were ever alleged. However, Defendant did not return Plaintiff to the rotation schedule until January 2019. Acting-up schedules were generally on ninety (90) day rotations and Defendant offers no justification for keeping Plaintiff out of the pool of eligible employees for the entire year. Even assuming the truth of Defendant's justification for the first quarter, January 1 through March 31, Defendant continued to deny Plaintiff the ability to act-up in the Control Center through the end of the year.

**VII.** **Plaintiff Was Denied Training**

Plaintiff's Class A license was scheduled to expire in July 2018. She was therefore required to take training prior to its expiration. Yadi Babapour called Plaintiff during one of her midnight shifts and asked her when her license expired. When Plaintiff told him that it expired in July 2018, Mr. Babapour confirmed that Plaintiff was scheduled for the February 2018 training session. When Plaintiff arrived for the training, she signed in and took a seat in the auditorium. Ed Salinas then went into the training and told Plaintiff that she was not scheduled for the training. Plaintiff told Mr. Salinas that Mr. Babapour had registered her and asked him to confirm this with Mr. Babapour. Mr. Salinas then left but returned with John Pope; at that point, they both instructed Plaintiff that she had to leave the training and Plaintiff did so. In the hallway, John Pope was very aggressive and told Plaintiff that she had no right to be there and to "get out of here." Mr. Babapour denied that Plaintiff had told him she wanted to be scheduled. According to Ed Salinas, if Plaintiff had wanted to go to the training, she could have done so if she had signed up with Mr. Babapour.

There were two other male employees of non-Bulgarian decent who were not registered for the training but who were not asked to leave and were allowed to stay until Plaintiff pointed

12

out to Mr. Pope and Mr. Salinas that she had been treated differently than them. Without the training, Plaintiff would not be able to renew her Class A license and would not be able to apply for the position of FE V. Mr. Salinas also physically scratched Plaintiff's name from the list – he did not do so for the two males of non-Bulgarian decent.

**VIII. Multiple Discriminatory Comments by Supervisors**

Ed Salinas has made comments about Plaintiff's gender and age. Plaintiff was in Mr. Salinas' office asking why she was not being permitted to act up for so long and why she was being deprived compared to her colleagues. Mr. Salinas responded, "women like you can't work in Control Center rotation shift. You don't know how to use computers in Control room. You have to obey your supervisor no matter what you think. You have to obey your supervisor no matter what." He also told Plaintiff that she was too old to work in Control Center in the rotation shift. Mr. Salinas made statements of this nature several times.

Moreover, Yadi Babapour made several statements to Plaintiff regarding her gender and national origin. Mr. Babapour asked Plaintiff why she was complaining and stated that she "should put [her] head down and follow like other women." He also referenced Syed Raheem's wife, stating "Syed's wife never work[ed] so why do you want to work?" and "Some women just prefer to stay at home." Yadi Babapour additionally told Plaintiff that if she did not like it here, she could always go back to her country where they don't have unions or any other place to go to complain. He said this when Plaintiff came into his office to ask about acting-up as a Filtration Engineer III. When Plaintiff questioned Mr. Babapour about not permitting her to act up in approximately March through June 2018, he would make comments such as "what do you think . . . because you have a Master's Degree, you special? and "It is not enough to have seniority.

13

You have to be suitable. . . . Why don't you follow -- why don't you put your head down and follow."

Even after filing her complaints with the Illinois Department of Human Rights in February and March 2017, Alan Stark made reference to Plaintiff's national origin and age. Plaintiff overheard Mr. Stark tell Clarence Wisnar "she might have a good training but is too old to work in the Control Center and go to all the activities." Mr. Stark also stated that he was not sure they had trainings where Tinka came from, but that "in her culture" Tinka believed she could attend training any time she wanted. – referring to national origin.

Based on the summary judgment submissions, it should be clear that there are indeed genuine issues of material fact in dispute and that the Defendant is not entitled to judgment as a matter of law, as to either the discrimination or the retaliation claims. There is no question that the acts of discrimination raised in this case occurred after Plaintiff filed the IDHR/ EEOC charges at issue in *Vassileva I*. Whether Defendant was continuing to discriminate against Plaintiff after March 2018 because of her national origin, sex, or age, or whether Defendant was retaliating against Plaintiff for asserting her rights is an issue the jury should determine. In either case, the Plaintiff has come forth with significant evidence that, if believed, would establish pretext. Plaintiff has set forth more than enough evidence, under any standard, to show that none of the purported reasons for Defendant's actions are genuine. Plaintiff has been denied upward mobility for two decades now – for no apparent reason. She has been treated differently than every one of her similarly situated, non-Bulgarian, largely male colleague for no legitimate reason. Plaintiff, who has spent years devoted to her job with the City, has been treated as if she was just hired with the other FE IIs/FEIIIs who are significantly younger than she is.

14

While Defendant suggests that Plaintiff cannot proceed with this case because of "claim splitting" concerns, the truth of the matter is that the court in *Vassileva I*, with the essential agreement of the parties, found that the only claims that would be considered in that case were those prior to March 2018. Plaintiff had no choice but to proceed in *Vassileva II* for those acts of discrimination occurring after March 2018.

For all of the foregoing reasons, this court must deny Defendant's Motion for Summary Judgment as there are genuine issues of material fact in dispute.

    Respectfully submitted,
    TINKA VASSILIEVA

    /s/ Deidre Baumann

    _____
    By:    Her Attorney

Baumann & Shuldiner
Counsel for Plaintiff
77 W. Wacker Drive, Suite 4500
Chicago, Illinois 60601

(312) 558-3119